MARTINSON, Appellant, v. NORTH CENTRAL LIFE INSUR-
ANCE COMPANY Respondent.*

*No. 214. Argued October 1, 1974.—Decided October 29, 1974.*
(Also reported in 222 N. W. 2d 611 and 225 N. W. 2d 604.)

---

* Motion for rehearing denied, without costs, on February 4,
1975.

For the appellant there were briefs by *Vernon Molbreak* and *Molbreak Law Office,* all of Madison, and oral argument by *Vernon Molbreak.*

For the respondent there was a brief by *Brian E. Butler* and *Stafford, Rosenbaum, Rieser & Hansen,* all of Madison, and oral argument by *Mr. Butler.*

BEILFUSS, J. The issues are as follows:

1. May a nonmedical examination credit life insurance policy validly provide that no insurance shall take effect thereunder unless the insured is in good health on the effective date thereof?

2. If so, must the insurer at least ask questions regarding the applicant's health or point out the policy's "good health" provision?

3. Is the trial court's finding that the insured was not in good health, and knew it, on February 21, 1967, contrary to the great weight and clear preponderance of the evidence?

The trial court concluded the issues in this case are controlled by *Clark v. Prudential Ins. Co.* (1935), 219 Wis. 422, 263 N. W. 364. In that case the defendant insurance company had issued a $500 credit life policy insuring the life of William Clark. The policy was issued without a medical examination, but provided, page 424:

"This policy shall not take effect if on the date hereof the insured be not in sound health, but in such event the premium or premiums paid hereon, if any, shall be returned."

The insured died six days after the date of the policy of high blood pressure related to heart disease. In an action to collect the proceeds the trial court found that on the date the policy was issued the insured was not in sound health but was afflicted with the disease that caused his death.

On appeal this court held that the "good health" provision was a valid condition precedent and was not affected by sec. 209.06, Stats.,[1] because that section ". . . deals only with representations and warranties, and has nothing to do with the conditions or coverage of insurance policies. . . ." The court also stated, page 425:

". . . There is no standard policy law with respect to life insurance, and no prohibition anywhere in the statute against accepting a risk without medical examination but upon condition that an insurable state of health exist when the policy is issued. . . . We conclude that there are no legal objections to requiring, at least in a policy involving no medical examination, that the insured be in sound health at the time of the issuance of the policy."

Both parties agree that the *Clark Case* represents the current state of the law in Wisconsin with respect to this issue, but the appellant contends that the case is not supported by sound public policy and urges that it be overruled. The appellant cites *Taluc v. Fall Creek Farmers Mut. Fire Ins. Co.* (1931), 203 Wis. 319, 234 N. W. 364, for the proposition that:

". . . the purpose of its [Wisconsin's] insurance law is to permit one to recover who in good faith has done all he is led by insurer's agent to believe he is required to do to secure insurance protection. . . ."

That statement is somewhat inaccurate, however, because what the court in *Taluc* in fact said, page 323:

". . . The very evident intent of sec. 209.06 is to permit one to recover when he, acting in good faith, has done honestly all he is led by the agent of defendant to

---

[1] "209.06 Insurance; application; effect. (1) No oral or written statement, representation or warranty made by the insured or in his behalf in the negotiation of a contract of insurance shall be deemed material or defeat or avoid the policy, unless such statement, representation or warranty was false and made with intent to deceive, or unless the matter misrepresented or made a warranty increased the risk or contributed to the loss."

believe he is required to do to secure protection by insurance."

In *Clark*, decided after *Taluc*, this court held that sec. 209.06, Stats., does not affect conditions precedent. Therefore, the cited language in *Taluc* is not controlling.

The reasoning behind the *Clark* decision demonstrates that it is based in sound public policy:

"There can be no doubt that the provision in question was intended as a condition precedent to liability. Not only does the language of the provision plainly indicate this, but the object and purposes of this type of insurance point inevitably in the same direction. Such policies are offered in small amounts to persons of limited means. In order to achieve a saving in cost and premium, no medical examination is required. The only way in which this increase in hazard may be compensated, is for the insurer to insist that there shall be open to it, between the date of the policy and the date when incontestability commences, the defense that insured was not in sound health when the policy was issued." *Clark, supra,* page 426.

The continuing validity of that statement, at least with respect to credit life insurance, is demonstrated by the fact that in 1972, 1,133,000 credit life policies were in effect in Wisconsin with an average amount per policy of less than $1,500.[2] The initial amount of the policy in this case was $2,380.60, with a life premium of $53.57. It seems apparent that if a complete medical examination was required for every such policy, the premium required would be much higher and the availability of such protection would be considerably diminished. Furthermore, as stated in *Brown v. Equitable Life Ins. Co.* (1973), 60 Wis. 2d 620, 629, 211 N. W. 2d 431:

" '. . . [I]t is fundamental that no contract of insurance should be rewritten by construction to bind an in-

[2] Institute of Life Insurance, 1973 Life Insurance Fact Book, page 23.

surer to a risk which it did not contemplate and for which it was not paid . . . .' "

*See also: Inter-Insurance Exchange v. Westchester Fire Ins. Co.* (1964), 25 Wis. 2d 100, 104, 130 N. W. 2d 185.

The general rule is that such clauses are valid and effective conditions precedent.

"Conditions in . . . policies of life . . . insurance, that they shall not take effect or be binding unless or until delivered to the insured while he is in good health, or the like, are, except as forbidden by statute, valid and enforceable. A condition that the applicant be . . . in good health when the policy is delivered is not unreasonable. Especially is this true where the policy is one issued without a medical examination." 1 Couch, *Insurance* (2d ed.), pp. 459-461, sec. 11.1.

"It is recognized, of course, that the insurer may provide that the policy shall not become effective until delivered to the insured while he is in good health, and such a provision is valid and binding upon all parties. . . ." 1 Appelman, *Insurance Law and Practice*, p. 236, sec. 151.

Appellant cites several cases from other jurisdictions to support her position. These cases are representative of a small minority view. We conclude that the "good health" condition precedent in nonmedical examination life insurance policies is not in conflict with the public policy of this state but rather serves a valid purpose allowing low cost policies to be more readily available than would otherwise be possible.

The appellant contends that where a medical examination is not required and an application form is not used, the insurer at least ask questions regarding the prospective insured's insurability.[3]

---

[3] This case has been decided upon the law as it existed in 1967. Since that time there have been statutory amendments in chs. 424 and 206 of the statutes dealing with credit life insurance which may affect the duties of the insurer as to notification and the insured's right as to a right to the return of the policy.

She relies essentially on two cases to support her position with respect to this issue. The first is *Southard v. Occidental Life Ins. Co.* (1966), 31 Wis. 2d 351, 359, 142 N. W. 2d 844, where this court stated that an applicant for life insurance ". . . is under no duty to volunteer information beyond the scope of the questions asked him. . . ." The second case is *Johnson v. Scottish Union & National Ins. Co.* (1896), 93 Wis. 223, 228, 67 N. W. 416, where the court held:

". . . Where a policy is issued without any application by the assured, and without any questions being put to him as to matters material to the risk, and it contains a clause that it shall be void if any fact material to the risk is concealed by the insured, it will not be invalidated by the fact that the assured did not disclose such material facts, if he did not intentionally or fraudulently conceal them. . . ."

Those cases dealt with the question of whether the insurer could avoid its obligations under the policy because of the concealments and misrepresentations of the insured. The court basically ruled that unless the insurer makes the appropriate inquiries of the insured it cannot defend its refusal to pay the policy proceeds by claiming that the insured concealed and withheld certain information. There was no condition precedent involved, as there is here, and thus the cases are distinguished.

This court has at least suggested that an insured who fails to read a policy when it is delivered to him is charged with knowledge of its provisions. *Bradach v. New York Life Ins. Co.* (1952), 260 Wis. 451, 456, 51 N. W. 2d 13. Such a holding with respect to "good health" conditions precedent would comport with the majority view. *See* 1 Couch, *Insurance* (2d ed.), p. 462, sec. 11.2, "The failure of the insured to read the policy or otherwise learn that it contains a 'sound health' provision does not relieve him of the condition."

The policy in this case was not a multi-page, esoteric document incomprehensible to the layman. It was half a page long with four short paragraphs. The back of the page was blank. The disputed provision was the first sentence of the second paragraph. There seems to be no reason why anyone attempting to read the policy would be unable to comprehend its meaning and understand the significance of the "good health" provision.

" 'Contracts of insurance rest upon and are controlled by the same principles of law that are applicable to other contracts . . . as long as the contract does not contravene law or public policy.' *McPhee v. American Motorists Ins. Co.* (1973), 57 Wis. 2d 669, 673, 205 N. W. 2d 152." *Brown v. Equitable Life Ins. Co.* (1973), 60 Wis. 2d 620, 628, 211 N. W. 2d 431.

Under general contract law principles:

". . . one who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party. . . ." 17 Am. Jur. 2d, *Contracts*, p. 497, sec. 149.

"Where one accepts a paper which he knows contains the terms of an offer, he will be bound by it, and cannot be heard to say that he did not read it or did not know what it contained. . . Acceptance of a document which plainly purports to be a contract gives rise to an implication of assent to its terms despite ignorance of the content thereof." 17 C. J. S., *Contracts*, p. 888, sec. 141.

We are of the opinion that in this case the insurer's failure to point out the condition precedent or inquire as to the applicant's health does not preclude it from asserting the failure of the condition in defense of its refusal to pay the policy proceeds.

The appellant argues that the trial court was in error in finding that Martinson was not in good health on February 21, 1967, and that he knew he was not in good health.

There are no serious discrepancies in the testimony of the two witnesses who addressed themselves to the issue of Martinson's health. Mrs. Martinson testified that her husband carried on his activities as normal after his 1965 heart attack. Dr. Beilman stated that he placed severe restrictions on Martinson's activity but admitted that it was hard to get him to slow down. The testimony is reconcilable by noting that although Dr. Beilman urged his patient to change the pattern of his activity, Martinson refused to do so.

Dr. Beilman's medical history of Martinson is uncontroverted and clearly supports the trial court's conclusion that Martinson was not in good health on February 21, 1967, and was aware of such fact. In response to a question as to whether he had informed Martinson prior to February 21, 1967, that he suffered from hypertension and arteriosclerosis, Dr. Beilman testified:

"Yes, repeatedly. I impressed him with the fact that he had two significant diseases and that they deserved follow-up, and he was very good about coming in."

The trial court's finding is not contrary to the great weight and clear preponderance of the evidence and, as such, it must be accepted by this court.

*By the Court.*—Judgment affirmed.